UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH LLOYD THURMAN, | No. 2:20-cv-0079-KJM-EFB P |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| RAYMOND JOHNSON, Warden, | |
| Respondent. | |

Petitioner is a California state prisoner who, proceeding without counsel, brings an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 2013 and in the Sacramento County superior court, petitioner was convicted of: (1) second degree robbery (Pen. Code § 211) and (2) illegal possession of a firearm (§ 29800, subd. (a)(1)). The jury also found true firearm enhancements for (1) use of a firearm in commission of the robbery (§§ 12022.5, subd. (a)(1), 12022.53, subd. (b)); (2) personally and intentionally discharging a firearm (§ 12022.53, subd. (c)); and (3) personally and intentionally discharging a firearm and proximately causing great bodily injury (§12022.53, subd. (d)). Finally, in a bifurcated proceeding, the jury found true that petitioner had previously been convicted of a serious felony (§§ 667, subds. (a), (e)(1), 1170.12, subd. (c)(1)) and that he had previously served five prison terms (§ 667.5, subd. (b)).

/////

Petitioner now argues that his rights were violated when the trial court failed to remove a juror for bias who discussed the case with other jurors prior to the beginning of deliberations.

For the reasons stated hereafter, the petition should be denied.

## FACTUAL BACKGROUND

The court has reviewed the state appellate court's summation of the facts. Having determined that it is consistent with the record, it is reproduced here:

### Prosecution's Case-in-Chief

> The victim testified that he was riding his bicycle on a trail around 3:00 p.m., which was his daily exercise regimen, when he encountered defendant. The victim had his cell phone in one hand when he came up behind defendant, who was walking on the trail. The victim testified that defendant then turned around, looked at him, brandished a small firearm, and ran toward him. The victim dismounted his bicycle, threw his phone in defendant's direction "hoping he would go for it," and kept his hands in the air. He testified that, as he was backing up, defendant kept coming toward him, demanding, "Give it up. Give it up." Defendant then asked the victim if he had a gun, which the victim denied. While the victim had a box cutter in his pocket, he denied removing or brandishing it. Defendant then told the victim to take off his clothes. The victim removed his clothing as instructed, and when he was left with only his socks on, he ran away from defendant. He testified that defendant came within about three feet of him before he ran away. The victim further testified that, as he was running away, defendant said, "'Take this with you, nigger,'" and shot him in the right thigh.
>
> The victim testified that he made it to a nearby road, flagged down motorists for help, and was taken to a hospital for treatment. The treating physician at the hospital testified that he opted not to remove the bullet because the risks of surgery outweighed the benefits of removing the bullet. The victim testified that the bullet is still in his leg, he suffers residual effects of pain and weakness in the leg, and he could feel the bullet move in his leg at times. He explained that his doctor advised him that the bullet could eventually surface near the skin, and if it does, it could be safely removed.
>
> Sacramento Police Officer Michael Boyd testified that he responded to the report of the shooting and found defendant, who matched the suspect's description, in the vicinity of the shooting. Officer Boyd testified that defendant started running away from the police car as soon as Boyd and his partner exited the vehicle. As Boyd chased defendant on foot, Boyd saw defendant throw a handgun onto the roof of a nearby building. Defendant continued to run until another officer stopped him with a Taser, and he was then taken into custody.
>
> A loaded semiautomatic .380-caliber handgun was recovered from the roof of the building where Boyd saw defendant throw his handgun. A pill bottle containing .380-caliber bullets was recovered

from defendant's pants pocket. A particle of gunshot residue was found on defendant's hand.

A cell phone was recovered from one of defendant's pockets. Officer Brian Laird testified that he dialed the cell phone number provided by the victim and the phone found on defendant rang.

The victim identified in a photograph the handgun recovered from the rooftop as the weapon defendant brandished during the robbery. The victim also identified defendant in a live lineup.

### Defense Evidence

The defense's theory of the case was that defendant shot the victim in self-defense after the victim brandished a box cutter and because defendant, who was under the influence of methamphetamine, believed the victim was a member of a drug dealer's gang which was out to get him.

Defendant testified that at the time of the shooting, he had been "strung out on crystal meth for a few days" and was headed home on the bicycle trail to "get cleaned up." He testified that he was paranoid because the previous day, he had an altercation with a drug dealer named "Panama Joe" over some drugs he had purchased. Defendant testified that, when he attempted to get his money back, he was beaten up by Panama Joe's gang and the gang then chased him away with firearms. Defendant testified that he purchased a handgun from another drug user to protect himself in the event he ran into Panama Joe's gang again. He then used methamphetamine all night without sleeping and went to McDonald's for breakfast where he saw two of the men from Panama Joe's gang who had beaten him the day before. Defendant said he panicked and ran away.

Defendant testified that he ended up walking on the bicycle trail to get home. He saw the victim come up behind him quickly on a bicycle and noticed that the victim was wearing a hoodie with his hands in the pockets despite the hot weather. Defendant stepped aside to let the victim pass but noticed the pedaling sound had stopped. He testified that he then turned around and saw the victim coasting on his bicycle in defendant's direction with a box cutter in his hand. Defendant, still under the influence of methamphetamine, saw the victim get off his bicycle and begin advancing toward him. Defendant then pulled his gun out of his pocket. He testified that the victim said to him, "We ain't letting you get away." Defendant told the victim to lift up his shirt to show that he did not have another weapon. Defendant testified that the victim then unexpectedly took off all his clothing. He denied ordering the victim to disrobe. When the victim started unbuckling his pants, defendant asked him "Dude, what are you doing?" Defendant testified that he did not know what was going on, started panicking, and backed away from the victim. Defendant then waved the gun and told him "Dude, just get out of here." He waived the gun in a way to suggest that the victim should leave. Defendant testified that the gun must have accidentally

3

> discharged. He claimed he did not hear the gunshot because of the traffic in the area and did not realize that the victim had been shot until his arrest.
>
> Defendant testified that after the victim ran away, he noticed the victim's cell phone on the ground and took the phone so he could call his wife. He claimed that when he saw police officers, he ran because he knew it was illegal for him to be in possession of a handgun, and he threw his gun on a roof so that the police would not shoot him. He denied taking the victim's bicycle.
>
> The Prosecution's Rebuttal Evidence
>
> Defendant acknowledged during the defense case that he did not tell the police about the box cutter in his initial interview but claimed that he did tell the police that the victim had a weapon. Officer Laird, the officer who interviewed defendant, testified in rebuttal that defendant did not mention that the victim had brandished a box cutter or any other weapon. Contrary to defendant's testimony in which he denied taking the victim's bicycle, Officer Laird testified that defendant admitted he took the victim's bicycle after the altercation.

ECF No. 15-10 at 3-6.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

I.    Applicable Statutory Provisions

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000). It does not, however, "imply abandonment or abdication of judicial review," or "by definition preclude relief." *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003). If either prong

4

(d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of constitutional error. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state law procedural principles to the contrary. *Id.* at 784-785 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

### A. "Clearly Established Federal Law"

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

### B. "Contrary To" Or "Unreasonable Application Of" Clearly Established Federal Law

Section 2254(d)(1) applies to state court adjudications based on purely legal rulings and mixed questions of law and fact. *Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2003). The two clauses of § 2254(d)(1) create two distinct exceptions to AEDPA's limitation on relief. *Williams*, 529 U.S. at 404-05 (the "contrary to" and "unreasonable application" clauses of (d)(1) must be given independent effect, and create two categories of cases in which habeas relief remains available).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." *Id.* at 405. This includes use of the wrong legal rule or analytical framework. "The addition, deletion, or

5

alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of the AEDPA." *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002). *See, e.g., Williams*, 529 U.S. at 391, 393 95 (Virginia Supreme Court's ineffective assistance of counsel analysis "contrary to" *Strickland*[1] because it added a third prong unauthorized by *Strickland*); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (California Supreme Court's *Batson*[2] analysis "contrary to" federal law because it set a higher bar for a prima facie case of discrimination than established in *Batson* itself); *Frantz*, 533 F.3d at 734 35 (Arizona court's application of harmless error rule to *Faretta*[3] violation was contrary to U.S. Supreme Court holding that such error is structural). A state court also acts contrary to clearly established federal law when it reaches a different result from a Supreme Court case despite materially indistinguishable facts. *Williams*, 529 U.S. at 406, 412 13; *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000) (plurality op'n).

A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407 08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 21 (2003). This does not mean, however, that the § (d)(1) exception is limited to applications of federal law that "reasonable jurists would all agree is unreasonable." *Williams*, 529 U.S. at 409 (rejecting Fourth Circuit's overly restrictive interpretation of "unreasonable application" clause). State court decisions can be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when they fail to give appropriate consideration and weight to the full body of available evidence, and

/////

/////

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).

[2] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[3] *Faretta v. California*, 422 U.S. 806 (1975).

6

1   when they proceed on the basis of factual error.  *See, e.g., Williams*, 529 U.S. at 397-98; *Wiggins*,
2   539 U.S. at 526 28 & 534; *Rompilla v. Beard*, 545 U.S. 374, 388 909 (2005); *Porter v.*
3   *McCollum*, 558 U.S. 30, 42 (2009).

4         The "unreasonable application" clause permits habeas relief based on the application of a
5   governing principle to a set of facts different from those of the case in which the principle was
6   announced.  *Lockyer*, 538 U.S. at 76.  AEDPA does not require a nearly identical fact pattern
7   before a legal rule must be applied.  *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).  Even a
8   general standard may be applied in an unreasonable manner.  *Id.*  In such cases, AEDPA
9   deference does not apply to the federal court's adjudication of the claim.  *Id.* at 948.

10         Review under § 2254(d) is limited to the record that was before the state court.  *Cullen v.*
11   *Pinholster*, 563 U.S. 170, 180-81 (2011).  The question at this stage is whether the state court
12   reasonably applied clearly established federal law to the facts before it.  *Id.*  In other words, the
13   focus of the § 2254(d) inquiry is "on what a state court knew and did."  *Id.* at 1399.

14         Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review
15   is confined to "the state court's actual reasoning" and "actual analysis."  *Frantz*, 533 F.3d at 738
16   (emphasis in original).  A different rule applies where the state court rejects claims summarily,
17   without a reasoned opinion.  In *Harrington*, *supra*, the Supreme Court held that when a state court
18   denies a claim on the merits but without a reasoned opinion, the federal habeas court must
19   determine what arguments or theories may have supported the state court's decision, and subject
20   those arguments or theories to § 2254(d) scrutiny.  *Harrington*, 562 U.S. at 101-102.

21         C.     "Unreasonable Determination of The Facts"

22         Relief is also available under AEDPA where the state court predicated its adjudication of
23   a claim on an unreasonable factual determination.  Section 2254(d)(2).  The statute explicitly
24   limits this inquiry to the evidence that was before the state court.

25         Even factual determinations that are generally accorded heightened deference, such as
26   credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2).  For
27   example, in *Miller El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court ordered habeas relief
28   where the Texas court had based its denial of a *Batson* claim on a factual finding that the

7

1 prosecutor's asserted race neutral reasons for striking African American jurors were true.
2 *Miller El*, 545 U.S. at 240.

3     An unreasonable determination of facts exists where, among other circumstances, the
4 state court made its findings according to a flawed process – for example, under an incorrect
5 legal standard, or where necessary findings were not made at all, or where the state court failed to
6 consider and weigh relevant evidence that was properly presented to it. *See Taylor v. Maddox*,
7 366 F.3d 992, 999 1001 (9th Cir.), *cert. denied*, 543 U.S. 1038 (2004). Moreover, if "a state
8 court makes evidentiary findings without holding a hearing and giving petitioner an opportunity
9 to present evidence, such findings clearly result in a 'unreasonable determination' of the facts"
10 within the meaning of § 2254(d)(2). *Id.* at 1001; accord *Nunes v. Mueller*, 350 F.3d 1045, 1055
11 (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section
12 2254(d)(2) because "state court . . . refused Nunes an evidentiary hearing" and findings
13 consequently "were made without . . . a hearing"), *cert. denied*, 543 U.S. 1038 (2004); *Killian v.*
14 *Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("state courts could not have made a proper
15 determination" of facts because state courts "refused Killian an evidentiary hearing on the
16 matter"), *cert. denied*, 537 U.S. 1179 (2003).

17     A state court factual conclusion can also be substantively unreasonable where it is not
18 fairly supported by the evidence presented in the state proceeding. *See, e.g., Wiggins*, 539 U.S.
19 at 528 (state court's "clear factual error" regarding contents of social service records constitutes
20 unreasonable determination of fact); *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) (state
21 court's finding that the prosecutor's strike was not racially motivated was unreasonable in light
22 of the record before that court); *Bradley v. Duncan*, 315 F.3d 1091, 1096 98 (9th Cir. 2002) (state
23 court unreasonably found that evidence of police entrapment was insufficient to require an
24 entrapment instruction), *cert. denied*, 540 U.S. 963 (2003).

25     II.    <u>The Relationship Of § 2254(d) To Final Merits Adjudication</u>

26     To prevail in federal habeas proceedings, a petitioner must establish the applicability of
27 one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional
28 invalidity of his custody under pre AEDPA standards. *Frantz v. Hazey*, 533 F.3d 724 (9th Cir.

8

2008) (en banc). There is no single prescribed order in which these two inquiries must be conducted. *Id.* at 736, 37. The AEDPA does not require the federal habeas court to adopt any one methodology. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

In many cases, § 2254(d) analysis and direct merits evaluation will substantially overlap. Accordingly, "[a] holding on habeas review that a state court error meets the § 2254(d) standard will often simultaneously constitute a holding that the [substantive standard for habeas relief] is satisfied as well, so no second inquiry will be necessary." *Frantz*, 533 F.3d at 736. In such cases, relief may be granted without further proceedings. *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062, 1070 71 (9th Cir. 2006) (finding § 2254(d)(1) unreasonableness in the state court's conclusion that the state had proved all elements of the crime, and granting petition); *Lewis v. Lewis*, 321 F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) unreasonableness in the state court's failure to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge, and granting petition); *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding § 2254(d)(1) unreasonableness in the state court's refusal to consider drug addiction as a mitigating factor at capital sentencing, and granting penalty phase relief).

In other cases, a petitioner's entitlement to relief will turn on legal or factual questions beyond the scope of the § 2254(d) analysis. In such cases, the substantive claim(s) must be separately evaluated under a de novo standard. *Frantz*, 533 F.3d at 737. If the facts are in dispute or the existence of constitutional error depends on facts outside the existing record, an evidentiary hearing may be necessary. *Id.* at 745; *see also Earp*, 431 F.3d 1158 (remanding for evidentiary hearing after finding § 2254(d) satisfied).

## DISCUSSION

I.   Juror Bias

Petitioner, as noted *supra*, argues that the trial court erred in failing to discharge a juror who was overheard making potentially biased comments prior to deliberations.

/////

/////

/////

9

A. <u>State Court Decision</u>

The state court of appeal rejected this claim on direct review:

**Additional Background and Defendant's Contentions**

At the beginning of trial, the court instructed the jury: "During the trial, do not talk about this case or about any of the people or any subject involved with this case [with] anyone, not even your family, friends, spiritual advisors, or therapist. [¶] . . . You must not talk about these things with the other jurors, either, until the time comes for you to begin your deliberations."

At the end of the trial, before the jury began deliberations, the trial court instructed the jury: "As I told you at the very beginning of the case, do not talk about the case or about any of the people or any subject involved in it with anyone . . . . [¶] You must discuss the case only in the jury room and only when all jurors are present together."

On a morning after the jury began its deliberations, Juror No. 9 called the court to say she had overheard a conversation between Juror No. 6 and someone she believed to be Juror No. 4 in the courthouse hallway on the previous court day, just before deliberations began. The court examined Juror No. 9 outside the presence of the rest of the jury. Although Juror No. 9 could not hear "word-for-word" what the two other jurors had said, she stated that she "could tell they were talking about the case to each other." She explained that she had the impression that the two jurors were "venting" about "how can this and that happen." She said that she believed that Juror No. 3 overheard the conversation as well.[4] The court asked Juror No. 9 whether the conversation affected her impartiality, and she said that it did not.

The court then questioned Juror No. 6 about the conversation. Juror No. 6 admitted that he had a brief conversation with another juror in the hallway about whether they would have "a conclusion by the end of the day," but did not "really discuss any details." He also said that another juror "made a comment about something," but other jurors said, "shh," so he did not hear what was said. The court asked him if the conversation contained "anything that happened during the case" or "more scheduling," and the juror confirmed that it was about scheduling. After questioning Juror No. 6 further about the substance of the conversation, the court admonished him, "[Y]ou're not to discuss the case in the hall in any way. And now that you all are in deliberations, even discussions about scheduling should occur in the jury deliberation room." The court also confirmed that the hallway conversation would not influence Juror No. 6's impartiality.

Lastly, the court questioned Juror No. 4. The court asked him whether the facts of the case were discussed during the hallway conversation, and Juror No. 4 replied, "I don't remember any of the

---

[4] [Footnote Two in Original Text] The court interviewed Juror No. 3, and she said she did not hear anyone discuss the case.

10

facts being said. It was just like general stuff, like what crooks do and, you know, generalization on that subject." The court questioned him further about whether he was discussing "crooks" in the context of this case, and the juror said that he mentioned "just crooks in general and what makes them do what they do." Thereafter the court asked the following questions and Juror No. 4 gave the following answers:

"THE COURT: All right. And so Juror [No.] 4 . . ., do you believe that before you got into the jury deliberation room you had made up your mind about the case — about this case?

"JUROR [No.] 4: Um, no, I wouldn't say a hundred percent.

"THE COURT: Because you know, as the Court has instructed, you have to have an opened [sic] mind, you have to listen to all the evidence, and that you then go into the jury deliberation room and you have an obligation to state what you feel about the case but also to listen to the views of each and every other juror?

"JUROR [No.] 4: Sure.

"THE COURT: All right. And so can you promise us that that is your mindset?

"JUROR [No.] 4: I can.

"THE COURT: Okay. And can you also promise us that you please do not talk about in the hall, don't make any comments about criminal law in general or —

"JUROR [No.] 4: You have my word.

"THE COURT: Okay. Because we don't want there to be something said that could be misconstrued by others.

"JUROR [No.] 4: That makes sense."

Following this colloquy with Juror No. 4, the trial court discussed the situation with counsel. Defense counsel expressed concern about whether Juror No. 4 could be fair and impartial because he was discussing "what crooks do" while serving on a jury in a criminal case, and because he hesitated when the court asked if he had made up his mind before deliberations. The court took a brief recess to review case law on the matter.

Thereafter, the court ruled as follows: "In this case I do not find that Juror [No.] 4, or any of the jurors for that matter, violated the Court's admonitions with respect to not discussing this case and not forming or expressing any belief about this case." The court then ruled that, even if there was misconduct, any misconduct was "of a trifling nature and it does not establish as a demonstrable reality that the juror, or any juror on this case, is unable to perform his or her duty." The court went on to find that Juror No. 4's "fleeting comment . . . does not establish to a demonstrable reality that he has pre-judged

11

the case, and certainly does not establish that he is a biased juror. And he, in fact, has affirmed that he can follow the law and the Court's admonitions." The court then denied the defense request to remove Juror No. 4, and asked counsel whether they wanted to request any additional curative instructions. Defense counsel stated that she thought that the court "properly admonished the offending jurors" and did not request any further curative instructions.

On appeal, defendant contends that, because doubt was cast on Juror No. 4's ability to perform his duties, the trial court erred in failing to discharge the juror. Specifically, he asserts that "Juror [No.] 4 necessarily rejected deliberation on all of [the] issues with his reference to 'crooks' and the acknowledgment that he had largely made up his mind before deliberations had begun." He contends that this was misconduct and raised a presumption of prejudice, which was not rebutted. Based on this hallway conversation, defendant contends that he was denied due process and a fair trial. We disagree.

**Right to Impartial Jury, Discharging Jurors, and Standard of Review**

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it."'" (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294, 84 Cal. Rptr. 2d 403, 975 P.2d 600 (*Hamilton*).) "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." (§ 1089.)

Thus, a trial court has the authority to discharge a juror if it finds the juror is unable to perform his or her duty, which includes engaging in serious and willful misconduct. (§ 1089; *People v. Harris* (2013) 57 Cal.4th 804, 856, 161 Cal. Rptr. 3d 364, 306 P.3d 1195 (*Harris*); *People v. Daniels* (1991) 52 Cal.3d 815, 863-864, 866, 277 Cal. Rptr. 122, 802 P.2d 906; *People v. Bowers* (2001) 87 Cal.App.4th 722, 729, 104 Cal. Rptr. 2d 726.) The trial court must investigate for juror misconduct if there is information, which, if proven true, would constitute good cause to doubt a juror's ability or willingness to perform the duties of a juror and would justify the removal of the juror. (*People v. Cleveland* (2001) 25 Cal.4th 466, 478, 106 Cal. Rptr. 2d 313, 21 P.3d 1225.) The judge must make whatever inquiry is reasonably necessary to determine whether the juror should be discharged and whether the impartiality of the other jurors has been affected. (*Ibid*.)

While a trial court has the authority to conduct an appropriate investigation concerning whether there is good cause to discharge a juror, and to discharge a juror, the court also has the authority to take "'less drastic steps [than discharge] where appropriate to deter any

misconduct or misunderstanding it has reason to suspect.'" (*People v. Alexander* (2010) 49 Cal.4th 846, 926, 113 Cal. Rptr. 3d 190, 235 P.3d 873 (*Alexander*).) Additionally, the trial court need not discharge a juror where the misconduct is trivial or "'trifling'" and could not have prejudiced the defendant. (*People v. Stewart* (2004) 33 Cal.4th 425, 510, 15 Cal. Rptr. 3d 656, 93 P.3d 271 [when misconduct is of such a trifling nature that it could not have been prejudicial and where it appears that the fairness of the trial has not been affected by such impropriety, the verdict will not be disturbed].)

We review the trial court's decision of whether to discharge or retain a juror or to take some other action for abuse of discretion. (*Harris*, *supra*, 57 Cal.4th at p. 856; *Alexander*, *supra*, 49 Cal.4th at p. 927.) "'"Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence."'" (*People v. Martinez* (2010) 47 Cal.4th 911, 943, 105 Cal. Rptr. 3d 131, 224 P.3d 877 [trial court's refusal to discharge juror affirmed], quoting *People v. Jablonski* (2006) 37 Cal.4th 774, 807, 38 Cal. Rptr. 3d 98, 126 P.3d 938.)

**Analysis**

Here, the trial court performed a thorough investigation of the alleged misconduct and reasonably determined that Juror No. 4 did not violate the court's admonitions. We note the instructions provided to the jurors admonished them: "do not talk about this case or about any of the people or any subject involved with this case or anyone." No instructions had been provided directing the jury not to talk about general criminal justice issues or "crooks in general." "A sitting juror commits misconduct by . . . failing to follow the instructions and admonitions given by the trial court. A lay juror cannot be expected to conform to standards of behavior of which she has not been informed." (*Hamilton*, *supra*, 20 Cal.4th at p. 305.) Thus, because no admonishment prohibiting discussion about criminal justice system issues in general had been given, Juror No. 4's comments did not amount to misconduct.

Further, the court properly exercised its discretion in ruling that, even if there was misconduct, it was of a trifling nature and the misconduct did not establish that the juror, or any juror on this case, was unable to perform his or her duty. We agree. The record simply does not show good cause to discharge Juror No. 4. While he admitted to mentioning "what crooks do" to another juror, he insisted that he was speaking generally and not specifically about defendant's case. This was consistent with Juror No. 6's statement that there was no discussion about the case. There is no evidence that Juror No. 4's statement was about defendant or a reference to the purported Panama Joe gang and defendant's version of events. Even assuming misconduct, like the trial court, we conclude it was trivial and, "[g]iven the . . . trifling nature of the misconduct and its minimal impact upon the case, we conclude that the record demonstrates no

13

> actual prejudice." (*People v. Ryner* (1985) 164 Cal.App.3d 1075, 1084, 211 Cal. Rptr. 140.)
>
> With respect to Juror No. 4's comment that he had not "a hundred percent" made up his mind about the case prior to deliberation, we conclude that substantial evidence supports the trial court's determination that the juror could fulfill his duties. In response to careful questioning by the court, Juror No. 4 promised to go into the deliberation room with an open mind and that he would listen to the views of the other jurors. Additionally, the trial court had the benefit of observing the juror's demeanor during the investigation and over the course of the trial and evaluated his responses accordingly. (*People v. Bennett* (2009) 45 Cal.4th 577, 621, 88 Cal. Rptr. 3d 131, 199 P.3d 535; *People v. Schmeck* (2005) 37 Cal.4th 240, 298, 33 Cal. Rptr. 3d 397, 118 P.3d 451, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-638, 130 Cal. Rptr. 3d 590, 259 P.3d 1186.) Based on its investigation and evaluation, the court was persuaded that the juror could continue to perform his duties impartially. (*Bennett*, at p. 621.) "[W]e afford deference to the trial court's credibility determinations, 'based, as they are, on firsthand observations unavailable to us on appeal.'" (*People v. Armstrong* (2016) 1 Cal.5th 432, 451, 205 Cal. Rptr. 3d 518, 376 P.3d 640.) Under the circumstances presented here, we conclude that the trial court acted well within its discretion in deciding not to remove Juror No. 4 from the jury and instead take the less drastic step of admonishing him about his duties as a juror and to avoid conversations about the criminal justice system.
>
> Furthermore, even if the juror had made a preliminary judgement of less than 100 percent about the case, there was no misconduct or improper bias. It is "human nature" that "a juror may hold an opinion at the outset of deliberations." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 75, 133 Cal. Rptr. 3d 548, 264 P.3d 336.) A juror who holds preliminary views about the case at the beginning of deliberations does not commit misconduct, "so long as his or her mind remains open to a fair consideration of the evidence, instructions, and shared opinions expressed during deliberations." (*Id.* at p. 73.) Courts "cannot reasonably expect a juror to enter deliberations as a tabula rasa, only allowed to form ideas as conversations continue." (*Id.* at p. 75.) The record before us does not demonstrate that Juror No. 4 refused to listen to all of the evidence, began deliberations with a closed mind, or declined to deliberate. Accordingly, we find no error.

ECF No. 15-10 at 7-14. Petitioner raised this claim in a petition for review to the California Supreme Court (ECF No. 16-3) which was summarily denied (ECF No. 16-4).

### B. <u>Legal Standards</u>

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. CONST. amend VI. However, "due process does not require a new trial every time a juror

14

has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.* A determination of juror bias "is essentially one of credibility, and therefore largely one of demeanor." *Patton v. Yount*, 467 U.S. 1025, 1038 (1984). Accordingly, "the trial court's resolution of such questions is entitled, even on direct appeal, to special deference." *Id.* (internal quotation marks omitted).

### C. Analysis

Here, as noted in the state appellate court's decision quoted *supra*, the trial court conducted an investigation and determined that the juror in question had not pre-judged the case and was not biased. The appellate court relied upon that finding, and it is entitled to further deference from this court. Indeed, a federal court is precluded from disturbing such a finding even where reasonable minds might disagree as to its correctness. *See Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about [a witness's] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). Petitioner has failed to demonstrate that no reasonable jurist could agree with the trial court's finding and, thus, his claim must be denied.

### CONCLUSION

For the reasons explained above, the state courts' denial of petitioner's claim was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: May 5, 2020.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE